******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., dissenting. I agree with the majority that the trial court's subordinate factual findings were not clearly erroneous, specifically, that as of December, 2013, it was unclear when the minor child in the present case, Oreoluwa O., would be medically able to travel, and, that as of the date of the trial on the petition for termination of the parental rights of the respondent father, Olusegun O., filed by the petitioner, the Commissioner of Children and Families, Oreoluwa was still not medically cleared to travel. Those subordinate factual findings, construed together with additional evidence in the record, including evidence that the respondent failed to travel to the United States in order to receive reunification services from the Department of Children and Families (department), provide sufficient evidentiary support for the trial court's ultimate factual finding pursuant to General Statutes (Supp. 2016) § 17a-112 (j) (1),[1] that, given the circumstances, the department made reasonable efforts toward reunification.[2] I therefore disagree with the majority that the Appellate Court improperly affirmed the judgment of the trial court terminating the parental rights of the respondent with respect to Oreoluwa. See *In re Oreoluwa O.*, 157 Conn. App. 490, 116 A.3d 400 (2015). The majority's conclusion to the contrary fails to accord proper deference to the trial court's factual findings. That is, rather than properly viewing the evidence in the light most favorable to sustaining the judgment of the trial court and considering all of the evidence along with the reasonable inferences drawn therefrom to determine whether the record provides sufficient support for the trial court's judgment, the majority draws every inference possible to reverse that judgment. To be clear, whenever inferences may be drawn from the evidence in the record or the findings of the trial court, the majority and I draw opposite inferences—I draw the inference that supports the judgment of the trial court, while the majority draws the inference least likely to support that judgment. In addition, rather than considering the totality of the evidence, the majority reviews the record selectively, considering only the evidence that does not support the judgment of the trial court, and ignoring or discounting the evidence that does provide support. Finally, the majority turns the sufficiency of the evidence analysis on its head by grounding its conclusion that the evidence was insufficient not on a consideration of the evidence that was presented, along with reasonable inferences drawn therefrom, but on information that was *not in the record*. In other words, the majority examines the record to determine what was absent, and concludes that the information that was missing renders the record insufficient to support the judgment of the trial court. The majority does not cite

to any authority to justify this approach to a sufficiency of the evidence inquiry.

Because I conclude that, viewing the evidence in the light most favorable to sustaining the judgment of the trial court, the Appellate Court properly affirmed the trial court's finding as to reasonable efforts; id., 502; I address the remainder of the respondent's claims on appeal, and conclude that the Appellate Court properly affirmed the trial court's finding that the respondent abandoned Oreoluwa and properly concluded that the respondent lacked standing to assert a due process challenge on behalf of Oreoluwa for alleged harms suffered by the respondent.[3] Id., 506, 509. Accordingly, I respectfully dissent.

I

I begin with the issue of whether the department expended reasonable efforts toward reunification. In order to grant a petition to terminate parental rights, the trial court is required to find by clear and convincing evidence that the department "has made reasonable efforts . . . to reunify the child with the parent . . . unless the court finds . . . that the parent is unable or unwilling to benefit from reunification efforts . . . ." General Statutes (Supp. 2016) § 17a-112 (j) (1). "The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged . . . . Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Samantha C.*, 268 Conn. 614, 632, 847 A.2d 883 (2004).

Because the question of whether the department made reasonable efforts depends on the particular circumstances of the case, I begin with the facts as evidenced in the record and found by the trial court. Pursuant to the applicable standard; see *In re Shane M.*, 318 Conn. 569, 587–88, 122 A.3d 1247 (2015); I review the trial court's subordinate factual findings for clear error and its ultimate determinations, including the determination that the department engaged in reasonable efforts, for evidentiary sufficiency. That is, I "consider whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]." (Internal quotation marks omitted.) *In re Gabriella A.*, 319 Conn. 775, 789, 127 A.3d 948 (2015). Because the majority does not abide by the applicable standard of review, I emphasize that "[i]t is not the function of this court to sit as the [fact finder] when we review the sufficiency of the evidence . . . rather, we must determine, in the light most favorable to sustaining the verdict, whether the totality of the

evidence, including reasonable inferences therefrom, supports the [judgment of the trial court] . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the [judgment] of which it is reasonably capable. . . . In other words, [i]f the [trial court] could reasonably have reached its conclusion, the [judgment] must stand, even if this court disagrees with it." (Internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 442, 815 A.2d 119 (2003). It is notable, as I will demonstrate later in this opinion, that the majority repeatedly and consistently construes the evidence in the manner *least* favorable to sustaining the judgment of the trial court.

The record reveals that the respondent's actions created a situation in which the petitioner was compelled to intervene in order to save Oreoluwa. Because of his choices and his actions, the respondent and his wife, Oreoluwa's mother, found themselves separated from their son by an ocean and the department was charged with the Herculean task of attempting to provide them with reunification services across that ocean. The trial court found that shortly before Oreoluwa's birth, his mother was among a group of pregnant Nigerian women who traveled to the United States for the purpose of giving birth in this country so that their babies would have dual citizenship in Nigeria and the United States. Although his wife suffered from mental illness, and had a history of postpartum depression, the respondent did not accompany her to the United States.

Although this account was the original explanation that the respondent and his wife offered for her trip to a foreign country so shortly before her due date, they later provided a different reason. They claimed that she had traveled here to shop for items for Oreoluwa prior to his birth, and decided to remain and deliver him here only after an ultrasound revealed that Oreoluwa had congenital heart defects. This revised account is consistent with the picture painted by the respondent of himself and his wife as hapless victims.

By contrast, the version of the story credited by the trial court reveals that the respondent took a calculated risk—gambling with the welfare of his mentally ill wife and his unborn child against the value of United States citizenship—that backfired on him, and then disavowed responsibility for the consequences of his actions and accused the petitioner of "wrench[ing]" his child from him. Any doubts as to the respondent's goals are quelled by his own words, in which he contrasted his chosen course of action with the choices of "other [A]fricans [who] are rushing to [E]urope." The ultimate goal was immigration—and there is nothing wrong with that— but it is completely disingenuous for the respondent to claim that he did not make choices that created a risk for both his unstable wife and his unborn child.

Accordingly, as a result of the respondent's own

choices, when Oreoluwa was born in January, 2013, at Yale-New Haven Hospital (hospital), the respondent was in Nigeria. At the time of his birth, Oreoluwa was diagnosed with complex congenital heart disease. Specifically, he was diagnosed with "[p]ulmonary [a]tresia, [v]entricular [s]eptal [d]efect, with [m]ajor [a]ortopulmonary [c]ollateral [a]rteries including a collateral from his coronary circulation." Oreoluwa's condition required the administration of medication precisely as prescribed or he was at risk of sudden death. When he was born, his mother was informed that if Oreoluwa traveled to Nigeria, he was likely to live for only approximately one month. On the basis of that information, she chose to remain in the United States with him so that he could receive the medical treatment he needed.

Within weeks after Oreoluwa's birth, it became apparent that the mother was having difficulty caring for him. In February, Oreoluwa's pediatrician noted the mother's failure to adhere to Oreoluwa's feeding schedule, which was crucial because he needed to gain weight before he could have the first of several required surgeries. In March, 2013, following Oreoluwa's first major surgery, his cardiologist was troubled when he learned that the mother was incorrectly administering Oreoluwa's medication, that she had moved from her sponsor family's home to a Super 8 motel, and that she had no suitable bed for Oreoluwa. The cardiologist also noted that the mother displayed a flat affect, giggled inappropriately and avoided making eye contact. On the basis of these observations, Oreoluwa was admitted to the hospital to allow hospital staff to monitor and assess the mother's ability to care for him. He was subsequently released to her care, but within a few days she brought him to the emergency department because she was unable to feed him properly. Oreoluwa was readmitted due to increased concerns about the mother's mental health and her ability to care for him.

In the latter half of April, 2013, during this second social admission, hospital staff attempted repeatedly to teach the mother how to properly feed and medicate Oreoluwa. Their efforts to teach her these basic tasks were unavailing. Staff also reported that during the hospital stay the mother displayed troubling and erratic behavior—refusing to care for and feed Oreoluwa, laughing inappropriately, screaming at staff, walking away while people were trying to speak to her, and locking herself in the bathroom. On the basis of all of these factors, hospital staff advised the petitioner that an order of temporary custody was necessary in order to ensure Oreoluwa's safety. Ultimately, the petitioner was compelled by these circumstances to remove Oreoluwa from his mother's custody. The mother was subsequently diagnosed with psychosis NOS (not otherwise specified), and was hospitalized.[4]

At the time that the petitioner removed Oreoluwa

from his mother's custody, the respondent was still in Nigeria. A few weeks later, following her release from the hospital, the mother first visited her cousin in New York, then returned to Nigeria without informing the petitioner that she was doing so and without attempting to visit Oreoluwa. The petitioner learned of her departure only after she had left the country. Both parents were now in Nigeria. Their son, Oreoluwa, was in Connecticut in the care of the petitioner.

On May 3, 2013, the petitioner filed a petition for neglect, alleging that Oreoluwa was being denied proper care and attention, that he was being permitted to live under conditions injurious to his well-being, and that his home could not provide the specialized care that he required. The court held a hearing on the petition in July, 2013. Neither the respondent nor his wife was present for the hearing—both were in Nigeria. During the hearing, the social worker assigned to the case attempted several times to place a telephone call to the respondent in Nigeria, in order to allow him to participate in the proceedings by way of speaker phone. Although it was confirmed that the respondent had been served with notice of the hearing, when an operator put the telephone call through, there was a busy signal on the other end of the line. At the hearing, the court heard evidence that the respondent had applied for a visa and had been denied. The court found that both the respondent and the mother had defaulted for failure to appear. The court also found that Oreoluwa was neglected and ordered him committed to the custody of the petitioner.

The court approved the preliminary specific steps that had been issued in May, 2013, and made some modifications to the orders with respect to the respondent. That is, pursuant to General Statutes § 46b-129 (j), in order for "the respondent to safely . . . regain custody" of Oreoluwa, he was ordered to take all possible steps to legally come to the United States to establish a relationship with Oreoluwa, and to visit him as often as the department permitted. The court did not order the department to provide the respondent with an immigration attorney or to directly aid the respondent with immigration services.[5] Instead, the specific steps direct the department to "[r]efer the respondent to appropriate services . . . ." At that point, the department already had referred the respondent to the appropriate services: the Nigerian consulate in New York. The remainder of the services that the department would be required to provide to the respondent were designated as "to be determined if [the respondent] comes to the [United States]." From the outset, therefore, pursuant to the trial court's order, the majority of the services that the department was obligated to provide to the respondent were conditioned on his presence in the United States.

Oreoluwa's mother returned to Connecticut with her father on July 31, 2013. The respondent remained in Nigeria. She stayed in Connecticut for approximately two weeks, during which time the department helped her to find a hotel in the area and provided her with information regarding available apartments. The department scheduled an administrative case review meeting while the mother was here so that she could participate and provided her transportation to the meeting. During the case review meeting, it was explained to the mother that in order for reunification to take place, she needed to be present in the United States. While the mother was here, the department provided her with supervised visitation with Oreoluwa, and provided her with transportation to visits. The department included the mother in a medical appointment for Oreoluwa, during which she was able to speak to and ask questions of his physicians. The department also facilitated a meeting between the mother and Oreoluwa's foster parents, during which she was able to ask questions about his daily schedule, current care and overall strengths and needs. She returned to Nigeria on August 13, 2013, stating that she needed to return to her normal routine to maintain her mental health stability.

By December, 2013, when Oreoluwa was eleven months old, the respondent had never met him. Following the birth of Oreoluwa, the respondent had filed applications for a visa to come to the United States on two occasions, but had been denied each time. His second visa application was denied in October, 2013, and the respondent had informed the department of the denial at that time. There was no indication that the respondent would be able to comply with the most basic and essential specific step ordered by the trial court: travel legally to the United States in order to establish a relationship with Oreoluwa. Indeed, because the *only* available evidence was that the respondent twice had been denied a visa, there was clear and convincing evidence that he would be unsuccessful in fulfilling this key specific step.

As for the mother, although she had Oreoluwa in her care for the first three months of his life, she had not seen him since her brief visit in August, 2013. Additionally, it was the mother's mental illness that compelled the petitioner to remove Oreoluwa and that prevented her from staying in the country to receive reunification services. As a result, she had had contact with Oreoluwa for only three and one-half months during his first eleven months, and she had not seen him at all for the past four months. Following her return to Nigeria and the expiration of her visa, the mother had informed the department that she did not intend to apply for another visa. When the petition for termination of parental rights was filed, the mother continued to require treatment in Nigeria for her mental illness. There was no reason,

therefore, to believe that the mother would be able to comply with her court-ordered specific steps.

On December 23, 2013, on the basis of all these facts, the petitioner filed the petition to terminate the respondent's parental rights. The petitioner asserted that the department had made reasonable efforts to reunify the respondent with Oreoluwa or the respondent was unable or unwilling to benefit from reunification efforts. As grounds for termination of the respondent's parental rights, the petitioner alleged that: (1) the respondent had abandoned Oreoluwa; and (2) there was no ongoing parent-child relationship.[6]

Shortly before the trial on the petition to terminate parental rights, the court approved the department's permanency plan, which recommended termination of the parental rights of both the respondent and his wife, and the adoption of Oreoluwa by his foster parents. The permanency plan relied on many of the same factors on which the petition for termination of parental rights relied, including that the absence of the parents from this country prevented the department from being able to offer them reunification services, and that they had thus far failed to comply with most of the court-ordered specific steps. Specifically, the only steps that the parents had complied with were the ones requiring them to maintain communication with the department and to obtain and maintain adequate housing. Additionally, because it was unlikely that the parents would obtain visas, it was improbable that they would be able to achieve significant compliance with the specific steps. Finally, Oreoluwa had bonded with his foster family, who wished to adopt him, and with whom he had lived since he was five months old. The foster family had been present for all of his medical procedures and major surgeries since he came into their care, and he was receiving routine regular and specialty medical care in the foster home. The department concluded that Oreoluwa's adoption by his foster family was in his best interest.

At the trial on the petition for the termination of parental rights, it was clear that the extraordinary nature of the particular circumstances in the present case played a major role in the court's finding that the department made reasonable efforts to reunify the respondent with Oreoluwa. By the time of the trial, Oreoluwa was approximately fourteen months old, and the respondent had yet to secure a visa to come to this country. As the court later explained in an articulation of its decision, the respondent's absence from this country "limited the type and number of services that the department has been able to provide to him." For instance, because the respondent was in Nigeria, the mere act of maintaining communication with him presented the department with significant challenges. Testimony established that when social workers assigned

to the case attempted to place telephone calls to the respondent, the telephone calls routinely did not go through, or, if they did, the connection was not good, and the calls frequently were cut off. The social workers had to rely on e-mails to communicate with the respondent. Sometimes, the respondent responded to the e-mails directly; at other times, he attempted to place a telephone call in response.

Viewed in light of the circumstances, the testimony and exhibits offered at the trial provided sufficient evidence to support the trial court's finding that the department made reasonable efforts to provide the respondent with reunification services. Specifically, despite the aforementioned difficulties with communication, the department maintained telephone and e-mail communication with the respondent to keep him updated on Oreoluwa's well-being and developments in his case. Additionally, the department consulted with its immigration specialist, William Rivera, and referred the respondent to the Nigerian consulate in New York. The department also explored possible placement options with family and friends of the respondent. When the respondent identified an alternative placement for Oreoluwa with a Pennsylvania family known to Oreoluwa's maternal grandfather, the department contacted the head of that family, Attorney Ayo Turton, but the respondent subsequently informed the department that he no longer wished it to consider placing Oreoluwa with Turton.[7] The department also contacted a maternal cousin, but that individual was not able to serve as a placement resource. Because the respondent had requested to be able to view Oreoluwa via Skype, an Internet based computer software application that permits video conferencing, the department attempted, albeit unsuccessfully, to obtain a computer device, such as an iPad, for the department's offices that would support Skype. The department also approached Oreoluwa's foster parents to determine whether they would allow the respondent to view Oreoluwa through Skype using their home computers, but the foster parents were uncomfortable with this suggestion.

At the trial on the petition, the respondent argued that there were reasonable efforts that the department could have made on the respondent's behalf, but did not. In addition to the services already provided, the respondent argued that the department should have given him more time to obtain a visa and also should have obtained an iPad to allow him to communicate with Oreoluwa via Skype. With respect to the provision of Skype technology, although the department attempted to comply with the respondent's request, the department contested the efficacy of using video conferencing technology to build a relationship between an infant and a complete stranger. Accordingly, the department argued, providing such a means of "communication" between the respondent and Oreoluwa did not

constitute a "reasonable" effort. As for the respondent's argument that he should have been allowed more time to obtain a visa, the department responded that further delay would be detrimental to Oreoluwa, and, as of the day of the trial, the respondent had provided no evidence that either he or his wife had taken any steps toward applying for a visa. The couple had merely offered the department the vague assertion that they were "working on it," without providing any details such as whether they had an appointment with the consulate.

In an oral decision, the court found by clear and convincing evidence that the department had made reasonable efforts to reunify the respondent with Oreoluwa. The court indicated that it was the respondent's failure to comply with the court-ordered specific step that he travel to the United States that prevented the department from being able to facilitate visitation with Oreoluwa, as the provision of that essential service depended on his presence in this country.[8] Because the trial court found that the department had made reasonable efforts to provide reunification services, it was not required to reach the question of whether the respondent was able to benefit from such services, which would have served as an alternative ground for terminating the respondent's parental rights. See *In re Jorden R.*, 293 Conn. 539, 552–53, 979 A.2d 469 (2009) ("[T]he department must prove either that it has made reasonable efforts to reunify or, alternatively, that the parent is unwilling or unable to benefit from reunification efforts. [General Statutes (Rev. to 2005) §] 17a-112 [j] clearly provides that the department is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element." [Emphasis omitted.]). The court also found that the petitioner had proven by clear and convincing evidence both grounds relied on to support termination of the respondent's parental rights, and further found that termination was in the best interest of the child.

In its subsequent articulation of its decision, the trial court made more detailed factual findings, emphasizing that the respondent's absence from this country greatly limited the ability of the department to provide him with reunification services. Under those circumstances, the court found that the department maintained communication with the respondent, explored alternative placement options, attempted to set up its computers for Skype communication, and referred the respondent to the Nigerian consulate, providing him with the relevant contact information. The court also made the express factual finding that Oreoluwa was not medically cleared to travel as of the date of the trial. Significantly, the court stated that it had relied on trial testimony in arriving at its findings and emphasized the principle that the trial court is the sole arbiter of the credibility of witnesses. Clearly, the trial court found the testimony

of the petitioner's witness, Cynthia Pfeifer, a social work supervisor with the department, who was the only witness to testify at the trial, to be credible.

Subsequent to the trial on the termination petition, the respondent moved for reargument and reconsideration, and sought a stay of the order granting the petition for termination of the respondent's parental rights. During the initial hearing on the motions, the respondent, who had retained immigration counsel, both in Connecticut and in Nigeria, argued that "[t]he single biggest obstacle for reunification was the visa application . . . ." The respondent contended that the provision of court-appointed counsel to represent him in the termination proceedings themselves was not sufficient—he claimed he was also entitled to immigration services, including appointed immigration counsel. He argued that the failure of the department to provide such counsel and services necessitated the finding that the department had failed to make reasonable efforts to reunify the respondent with Oreoluwa. Counsel for the respondent summarized his view of the present case in his request for supplemental briefing on the following issue: "What . . . is [the] department's obligation to help a parent obtain a visa?"

As to this claim, I agree with the Appellate Court, which properly concluded that the department was not required to provide the respondent with immigration counsel in order to satisfy the "reasonable efforts requirement." *In re Oreoluwa O.*, supra, 157 Conn. App. 498. The respondent cites to no statute or regulation that contemplates that the department should provide immigration services to noncitizen parents living in a foreign country. The department's immigration practice guide in its policy manual does not address this factual scenario. The manual contemplates the provision of *some* immigration assistance to adult clients who are in this country, stating that its social workers "shall assist undocumented adult clients with issues related to their immigration status." Dept. of Children & Families, Policy Manual § 31-8-13. Even that assistance is somewhat limited, however. The manual defines "[a]ssist" to mean, "for example, to help fill out forms and provide a referral to an immigration attorney. [The department] shall *not* pay for legal services or otherwise take responsibility for an adult client's immigration status." (Emphasis in original.) Id. Moreover, the respondent's claim that the department has a duty to provide immigration services to noncitizen parents who are living abroad and whose child has been committed to the care of the petitioner, implicates significant public policy concerns that are properly resolved by the legislature, not the courts.[9]

As I have explained, there was sufficient evidence in the record to support the trial court's ultimate factual finding that under the facts of the present case, there

was clear and convincing evidence that the department made reasonable efforts toward reunification. The majority, however, focuses its analysis on Oreoluwa's ability to travel, specifically on the question of whether, as of the time of the trial, it was possible to determine when he would be able to travel. This issue is a red herring. As I will explain herein, this issue was not raised at the trial court. The parents barely raised the issue of whether he was medically cleared to travel as of the date of the trial, but the trial court made a finding as to that issue, stating that Oreoluwa could not travel as of the date of the trial. The parents, however, did not raise the question of whether it was still not possible to determine, as of the date of the trial, when Oreoluwa might be able to travel. Moreover, I question how this issue is relevant to the determination of whether the department made reasonable efforts toward reunification. The specific steps ordered by the trial court all contemplated that reunification efforts by the department were contingent on the respondent being present in this country. The majority, by contrast, implicitly suggests that the department should have attempted to provide reunification services to the respondent by sending Oreoluwa to Nigeria.

For example, the majority states that if the record had established that Oreoluwa would have been medically cleared to travel "at some point in the not so distant future, it would likely have been reasonable for the department to conduct a home study of the respondent in Nigeria." See footnote 10 of the majority opinion. The requirement to conduct a home study is predicated on the premise that it would be reasonable to require the department to provide reunification services to the respondent in Nigeria, after sending Oreoluwa to that country. This assumption is highly questionable in light of the concession at the termination trial that there is nothing akin to the Interstate Compact on the Placement of Children; see General Statutes § 17a-175; that would govern relations between Connecticut and Nigeria in this context, and there is no department liaison in Nigeria.

Evidence adduced at the trial on the termination petition supports the conclusion that there are simply no statutes, regulations or procedures in place to dictate whether and how the department should send a child born in the United States to a foreign country to live with his or her parents. Specifically, after Pfeifer testified that Oreoluwa was not medically cleared to travel, the respondent's counsel engaged her in the following colloquy:

"Q. Now, in your direct testimony, you stated that you've been in the department's . . . employment for about sixteen years, roughly fifteen years?

"A. Yes.

"Q. In your experience, have you had situations where children were born in the United States and were then sent to their country of origin of their parents?

"A. Directly under my supervision?

"Q. Yeah.

"A. No."

In Pfeifer's experience of fifteen or sixteen years with the department, the department had never sent a child born in the United States to a foreign country to live with his or her parents. Never. During a hearing on the respondent's motion for reargument, reconsideration and a stay of judgment, the respondent's counsel confirmed that his "exhaustive" research confirmed that Pfeifer's personal experience was not isolated. He was unable to uncover a single instance in which the department had done or had been held required to do what the respondent now insists it is statutorily required to undertake as part of its reasonable efforts to reunify him with Oreoluwa—sending the child to a foreign country to live with parents who are completely unknown to him.

The majority relies on authority from other jurisdictions to support its dicta that a home study would be reasonable if it were determined that Oreoluwa would be medically cleared to travel at some point in the future. I observe that those authorities do not speak to the uncontroverted fact that in this state an undertaking of this sort has never been done, there is an absence of any applicable statutes, regulations or procedures that would serve to effectuate it, and there is a conceded lack of any liaison in Nigeria.

I further observe that the authorities relied on by the majority do not provide support for the conclusion that it would be reasonable under Connecticut law to require the department to conduct a home study in Nigeria. The majority relies on two decisions. The first, *In re E.N.C.*, 384 S.W.3d 796, 798 (2012), involved a father who had been deported to Mexico after living with his wife and children in Texas for eight or nine years. There was testimony at trial that the father "was a good father who provided support for the children." Id., 799. Even after he had been deported, the father continued to visit with the children, who traveled to Mexico for that purpose. Id. Testimony at trial established that after visits, the children "did not want to come home and . . . wanted to stay with their father in Mexico." Id. More importantly, nothing in the decision discusses the relevant Texas statutes and regulations providing for home studies in Mexico, so that case sheds no light on whether it would be reasonable to impose the same requirements on the department in the present case. The second case relied on by the majority, *In re Doe*, 153 Idaho 258, 281 P.3d 95 (2012), is even less on point. That decision says nothing about whether it would be

reasonable for Idaho child protection authorities to conduct a home study in Mexico, where the father lived. The decision merely notes that Mexican authorities conducted a home study, and reports the results of that study. Id., 263.

I also observe that the majority relies on an article that details the case management services provided by the International Social Service-USA Branch Intercountry Case Management Division. F. Northcott & W. Jeffries, "Forgotten Families: International Family Connections for Children in the American Public Child-Welfare System," 47 Fam. L.Q. 273 (2013). Despite the fact that services were provided in forty different states, the article makes no mention whatsoever of such services being provided in Connecticut. Id.

The majority also claims that by looking to Pfeifer's testimony and the respondent's concession that the department has never sent a child born in the United States to a foreign country to live with his or her parents, I engage in fact-finding. To the contrary, I apply the proper standard of review, which the majority fails to do. That is, I construe the evidence in the light most favorable to sustaining the judgment of the trial court.

Finally, I observe that there are significant problems with the majority's suggestion that it would be reasonable to require the department to send Oreoluwa to Nigeria for the provision of reunification services in that country. For instance, even assuming that there were sufficient mechanisms in place to allow the department to facilitate reunification services in Nigeria, where would Oreoluwa stay while these services were being provided? With the complete strangers who made the choices that resulted in the petitioner being required to take custody of him? The respondent had never met Oreoluwa. The respondent's wife was psychotic, and unable to take care of Oreoluwa. If Oreoluwa could not reside with them, then where should he stay? Is there an agency in Nigeria where he could be placed? Once the child is in Nigeria, outside the jurisdiction of Connecticut, how would the department be able to guarantee that reunification services would be performed at all? Because I conclude that it would not have been reasonable to require the department to send Oreoluwa to Nigeria in order to provide reunification services there, I would end the sufficiency inquiry without delving into the issue of Oreoluwa's ability to travel.

Even assuming that the majority is correct that it would have been reasonable to require the department to send Oreoluwa to Nigeria and to provide reunification services in that country, however, I would conclude that there was sufficient evidence to support the trial court's ultimate finding that the department made reasonable efforts toward reunification. Before I discuss the arguments, evidence and findings of the trial court on this issue, I offer the following clarification of the

majority's analysis. Although the majority does not directly state so, it appears to suggest that the question of whether Oreoluwa was medically cleared to travel is broken down into two distinct factual questions that are relevant to whether the department satisfied its burden to establish reasonable efforts toward reunification. The majority concedes that the trial court made an express finding as to the first factual question, namely, whether Oreoluwa was medically cleared to travel as of the date of the trial on the termination petition. As to that question, the trial court found that Oreoluwa "was still not cleared to travel as of the date of the trial." The majority admits that the court's finding was not clearly erroneous. The second factual question is whether, as of the date of the trial, it had become possible to determine when Oreoluwa would be able to travel, and, if the answer to that question was yes, when the child would be medically cleared to travel. The majority relies on the failure of the trial court to make these very specific, *express* factual findings to reverse the judgment of the Appellate Court affirming the trial court's judgment terminating the respondent's parental rights. That is, I understand the majority to be claiming that, in the absence of a finding by the trial court that at the time of the trial on the petition, it was still not possible to determine when Oreoluwa would be able to travel, there was insufficient evidence in the record to support the trial court's ultimate factual finding that the department made reasonable efforts toward reunification. I disagree.

The majority is only able to arrive at its conclusion by ignoring the applicable standard of review, which requires this court to consider all of the evidence in the record, along with reasonable inferences drawn therefrom, and construe the record in the light most favorable to sustaining the judgment of the trial court. In arriving at its conclusion, the majority applies precisely the opposite presumption, viewing the evidence in the light least favorable to sustaining the judgment, and drawing inferences least likely to support the judgment. By doing so, the majority is able to discount evidence that would support the conclusion that even in the absence of an express finding by the trial court, there was sufficient evidence in the record to support a finding that as of the date of the trial, it remained unclear when Oreoluwa would be cleared to travel.

A careful reading of the trial court's articulation is the best starting point. The court did not merely find that Oreoluwa was not cleared to travel as of the date of the trial. It stated: "As of December, 2013, [Oreoluwa] was not able to travel to Nigeria due to his medical status, *and it was not clear when he could do so. . . .* He was *still* not cleared to travel as of the date of the trial." (Emphasis added.) The trial court failed expressly to include, after the word "still," that as of the date of the trial, it remained unclear when Oreoluwa would be

able to travel. That failure creates an ambiguity as to whether the trial court found that as of the date of the trial it remained unclear when Oreoluwa would be cleared to travel. It is not, however, unreasonable to read the trial court's articulation to implicitly make that finding. The standard of review requires that we resolve such ambiguities consistent with the judgment of the trial court. The majority, however, does not feel bound by the standard of review and resolves the ambiguity in the manner most consistent with its view of how the case should be resolved. In contrast to the majority, I read the articulation pursuant to the standard of review and resolve the ambiguity consistent with the trial court's judgment. That is, I read the articulation to implicitly find that, as of the date of the trial, it still could not be determined when Oreoluwa would be able to travel. Given that implicit finding, this court could reverse the Appellate Court's judgment only if the trial court's finding was clearly erroneous, and it was not.

Even in the absence of that implicit finding, I would conclude that there was sufficient evidence in the record to support the ultimate finding of the trial court as to reasonable efforts. The question of whether, as of the date of the trial, it remained unclear when Oreoluwa would be medically able to travel to Nigeria, was not the primary focus at the trial on the petition to terminate parental rights. At the trial on the petition, both parents touched very briefly on the issue of whether Oreoluwa was medically cleared to travel as of the date of the trial, and simply speculated that Oreoluwa *might* be medically able to travel. The parents suggested that the department could not reasonably rely on the reports of Oreoluwa's cardiologists, provided as recently as January 14, 2014, stating that Oreoluwa was not medically cleared to travel and that it was at that time unclear when he would be.

Similarly, the majority's conclusion suggests that the only evidence in the record relevant to whether it could be determined as of the date of the trial when Oreoluwa would be medically cleared to travel was the April 29, 2013 affidavit by Oreoluwa's treating cardiologists. In fact, the majority incorrectly states that "the only evidence presented at trial that related to when Oreoluwa would be cleared to travel indicated that, before he was born, physicians expected that he would be unable to travel for at least one year from his birth." That statement ignores evidence that supports the judgment of the trial court. Specifically, the petition for termination of parental rights, which was admitted into evidence at the trial, relies on much more recent reports offered by Oreoluwa's physicians, reports that provide ample support for the trial court's finding, particularly given the highly deferential standard of review accorded to the trial court's subordinate factual findings. It is helpful to review the evidence in detail.

As I have noted, the trial court expressly found that Oreoluwa was not medically cleared to travel as of the date of the trial. The issue first was raised during the respondent's cross-examination of Pfeifer, who was asked whether, as of the day of the trial, Oreoluwa had been medically cleared to travel. She responded without qualification that he was not. Specifically, she testified that when Oreoluwa was born, his physicians informed his mother that he would be unable to travel for *at least* one year, and further testified that, as of the date of the trial, at which time Oreoluwa was more than one year old, he was still not cleared to travel. That testimony regarding the original estimate of when Oreoluwa would be able to travel was corroborated by an April 29, 2013 affidavit by Oreoluwa's treating cardiologists, which stated that they anticipated that Oreoluwa would have the second of "several" required surgeries sometime around his first birthday. Neither the respondent nor his wife challenged Pfeifer's testimony as to this matter and they did not offer any evidence to controvert it. Moreover, at oral argument before this court, the respondent conceded that Oreoluwa's original prognosis was that he would be medically unable to travel for at least one year. That original prognosis, therefore, suggested that Oreoluwa's travel status might change after his first year.

Subsequently, however, Oreoluwa's physicians provided an updated, less definite estimate of when he would be able to travel. That more updated estimate is set forth in the social studies in support of the petition for termination and the permanency plan, both of which were introduced into evidence. Each social study includes a section detailing the most recent reports that the department had received from Oreoluwa's numerous physicians. Specifically, when the petition for termination of parental rights was filed, Oreoluwa's physicians reported to the department that his most recent surgery had taken place on October 10, 2013, during which cardiologists replaced a shunt, which led from his innominate artery to the right pulmonary artery, with a conduit. Although that procedure had gone well, as had a cardiac catheterization procedure, the physicians' most recent estimate provided to the department and recorded in the social study was that "Oreoluwa is not able to travel to Nigeria due to his medical status and it is unclear at this time when he would be cleared to travel."

This estimate, provided when Oreoluwa was eleven months old, differs from the one that was provided at the time of Oreoluwa's birth, which established a possible end date of one year. By contrast, the more recent estimate provided no potential end date. That is, as compared to the initial estimate that Oreoluwa might be able to travel by his first birthday, the most recent report from his physicians, reflected in the social

study that was filed when Oreoluwa was eleven months old, did not provide *any* estimate of the earliest date on which Oreoluwa could travel. I draw the reasonable inference from those two pieces of evidence, viewed together, in the light most favorable to sustaining the judgment of the trial court, that it remained unclear, at the time of the trial, when Oreoluwa would be medically cleared to travel. It would indeed be reasonable to infer that, if anything, it had become *less* certain when Oreoluwa would be medically cleared to travel.

The study in support of the permanency plan, prepared on January 14, 2014, more than one month after the study in support of the petition for termination, includes additional, updated information relayed to the department from Oreoluwa's treating physicians. The study reports that Oreoluwa's December 3, 2013 cardiac catheterization went well. One of his physicians reported that he had closed one of Oreoluwa's arteries during the procedure, and that there was another artery that he could close off. The success of that procedure, however, did not prevent both the treating cardiologist and Oreoluwa's pediatric cardiologist, Bevin Weeks, from emphasizing that Oreoluwa continued to need additional cardiac surgeries and procedures. The study further reflects that at the time of its preparation, Oreoluwa's travel status had not changed—he was still not medically able to travel, and it was still not able to be determined when he would be cleared to travel. This piece of evidence provides further support for the determination that, as of the date of the trial, Oreoluwa was not medically able to travel and it was still not possible to determine when he would be cleared to travel.

Although the majority initially ignores the evidence in the social studies entirely, it later attempts to discount that evidence in response to this dissent, suggesting that because the studies were "prepared and written in the department's own language," the information contained therein somehow does not accurately reflect the most recent information received from Oreoluwa's physicians, despite the fact that the notations in the social studies indicate that the information recorded was received from those physicians. See footnote 8 of the majority opinion. The majority thus draws an inference based on the evidence that is inconsistent with the judgment of the trial court. The majority also complains that the studies were "not accompanied by any medical reports or documentation," again calling into question the accuracy of the information contained in the social studies. Id. It was the trial court's duty, not the majority's, to weigh the evidence and determine whether to credit it. By contrast, the majority has no difficulty relying on those same social studies as reliable and accurate when the information provided therein supports the majority's conclusion. For instance, the majority does not question the accuracy or the source of the information in the social studies to the extent

that they reflect that Oreoluwa was not suffering developmental delays from his medical condition. Thus, the majority selectively relies only on the evidence that supports its conclusion and undercuts the conclusion of the trial court. This is not consistent with the applicable standard of review.

Moreover, the majority questions the estimated date of Oreoluwa's ability to travel set forth in the social studies because the language in the social study in support of the permanency plan regarding Oreoluwa's ability to travel was the same as that in the study in support of the petition for termination. Rather than inferring that the lack of change in the language in the social studies reflected a lack of change in Oreoluwa's status, the majority dismisses that lack of change in his status because the social study in support of the permanency plan "repeated the same lines" that were used in the social study in support of the petition for termination. The majority suggests, therefore, that the department personnel who prepared the January, 2014 social study in support of the permanency plan, just cut and pasted the same sentence into the report, and those statements did not reflect that Oreoluwa's travel status had not changed since the filing of the petition. Although the majority's inference is certainly one that the trial court could have drawn, the trial court's judgment is consistent with the opposite inference, namely, that the department's statement in the social study in support of the permanency plan reflects updated information on Oreoluwa's travel status. That inference is a reasonable one because the social study clearly reflects that the department was in frequent communication with and received ongoing updates from the cardiologists, stating repeatedly that various physicians "reported" the relevant information that was recorded by date in the social study. The majority's inference to the contrary is not consistent with the role of a reviewing court.

Finally, the majority claims that, by noting the difference in the two estimates, and construing that *evidence* in the manner most favorable to sustaining the judgment of the trial court, I engage in "fact-finding." See footnote 8 of the majority opinion. The majority appears to forget that when this court engages in a sufficiency of the evidence inquiry, we examine the facts as found by the trial court, and the totality of the evidence, including reasonable inferences drawn therefrom, construed in the light most favorable to sustaining the judgment of the trial court. Consistent with that standard, I do what the majority should have done, and review the record to determine what evidence was presented that would support the judgment of the trial court. When evidence lends itself to a reasonable inference that supports the judgment of the trial court, and, therefore, on which the trial court reasonably could have relied, I draw that inference. Only after reviewing the entire record in this manner is it appropriate to inquire whether there is

sufficient evidence to support the trial court's ultimate factual finding that the department made reasonable efforts toward reunification. *In re Gabriella A.*, supra, 319 Conn. 790. Observing that the original estimate of when Oreoluwa would be able to travel was more definitive because it provided a possible end date, as compared with later estimates, which provided no end date, is a reasonable inference drawn when those two facts are considered together. The majority draws no such inferences that would support the judgment of the trial court, notwithstanding the clear requirement under the standard of review that this court, as a reviewing court, must do so in determining whether the evidence is sufficient.

The revised, more conservative estimate that cardiologists provided as to when Oreoluwa would be medically able to travel, taken together with Pfeifer's testimony, which the court found to be credible, and the trial court's specific findings in the articulation, when construed in the light most favorable to sustaining the judgment, provide sufficient evidentiary support for the conclusion that as of the date of the trial on the petition for termination, it remained unclear when Oreoluwa would be cleared to travel. The majority construes the evidence in a different light—declining to infer that the difference between the initial estimate given to the department by Oreoluwa's cardiologists, as testified to by Pfeifer, and the later estimate that the cardiologists provided to the department, as noted both in the social study in support of the termination petition and the social study in support of the permanency plan, had any meaning. Certainly, it is *possible* to construe the evidence in the manner that the majority does. I do not dispute that, nor is it necessary to do so. The mere fact that the majority's construction of the evidence is one possible manner of viewing it, however, is not sufficient given the standard of review, which requires us to construe the evidence in the light most favorable to sustaining the judgment. The majority's rationale would be supported only if it could demonstrate that the construction of the evidence that I suggest is not a reasonable one. And that, the majority cannot do.

Another illustration of the majority's lack of deference to the trial court's findings is its selective summary of the facts. For example, the majority cites to the report by Oreoluwa's physician that Oreoluwa was "doing well and [could] start on whole milk and more solid foods." That report is only part of the story. The majority completely ignores the fact that at the time that the termination petition was filed, Oreoluwa continued to require regular monitoring of his oxygen levels and in-home nursing services twice a week. If the majority had applied the proper standard of review, it would have considered the facts in the record that actually support the trial court's ultimate factual finding. Instead, the majority ignores those facts entirely, and highlights only

the evidence that supports reversal.

The majority also relies on the fact that Oreoluwa was scheduled to have appointments with his pediatric cardiologist in January and March, 2014, as a basis for its conclusion that the trial court's finding that the department made reasonable efforts was not supported by sufficient evidence. This reading of the record turns the applicable standard of review on its head. First, the majority's inquiry does not properly focus on the evidence that was presented, and whether that evidence, considered cumulatively with all appropriate inferences drawn therefrom, was sufficient, but instead focuses on what was *not* admitted into evidence. That is contrary to the very nature of a sufficiency of the evidence inquiry, in which the reviewing court examines what is actually *in* the record and asks whether it is sufficient. Second, the majority continues to draw inferences least favorable to sustaining the judgment of the trial court. It should come as no shock that a child with Oreoluwa's serious condition had regular, ongoing medical appointments with specialists. Reading this evidence in the light most favorable to sustaining the judgment of the trial court, the majority *should* reason that those scheduled appointments further demonstrated that although Oreoluwa's treatment was progressing well, he was still a child who needed significant, highly skilled care and frequent monitoring by specialists. Rather than relying on this additional information in the record as further evidence that the evidence was sufficient to demonstrate that it remained unclear when Oreoluwa would be cleared to travel, however, the majority infers, without directly stating so, that there could have been information to the contrary presented at the meeting of Oreoluwa's physicians. The majority offers no explanation as to how such an inquiry is part of the inquiry as to whether the evidence that was presented was sufficient—and the only evidence in the record is that Oreoluwa's team of cardiologists had recently declined to provide *any* estimate as to when he would be medically cleared to travel.

On the basis of the foregoing, and applying the proper standard of review, I conclude that the trial court's subordinate finding that Oreoluwa was not medically able to travel was not clearly erroneous, and, therefore, that the trial court's ultimate factual finding that the department made reasonable efforts was supported by sufficient evidence. I would accordingly affirm the judgment of the Appellate Court, concluding that the department made reasonable efforts toward reunification of the respondent and Oreoluwa.

## II

I next address the respondent's claim that the Appellate Court improperly concluded that the trial court's finding that he abandoned Oreoluwa was not clearly erroneous. Because I conclude that there is sufficient

evidence in the record to support the trial court's finding that the respondent abandoned Oreoluwa, I would affirm the judgment of the Appellate Court.

"For purposes of termination proceedings, abandonment has been defined as a parent's fail[ure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . . General Statutes [Rev. to 2015] § 17a-112 (j) (3) (A). Maintain [as used in that statute] implies a continuing, reasonable degree of interest, concern, or responsibility and not merely a sporadic showing thereof." (Internal quotation marks omitted.) *In re Santiago G.*, 318 Conn. 449, 472, 121 A.3d 708 (2015). "Abandonment focuses on the parent's conduct." *In re Juvenile Appeal (Docket No. 9489)*, 183 Conn. 11, 14, 438 A.2d 801 (1981). "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Internal quotation marks omitted.) Id., 15.

The following additional facts are relevant to the resolution of this claim. The trial court found that the respondent "demonstrated some degree of interest in and concern for the welfare of Oreoluwa." The trial court specifically noted that the respondent had maintained communication with the department, calling approximately four times per month to check on Oreoluwa, and also had inquired as to how he could provide financial support for him. The department responded to the respondent and requested that he provide verification of his income in the form of pay stubs or tax information, to enable the department to establish a rate for the respondent to pay child support. The respondent did not send the information and never responded to the request. The court also found that although the department provided the respondent with information so that he could send correspondence, cards or gifts to Oreoluwa, he had not done so.[10]

Although the Appellate Court agreed with the trial court that the record revealed that the respondent had demonstrated " 'some degree' " of interest in Oreoluwa's welfare, it also concurred with the trial court's observation that the statutory standard required more than that. *In re Oreoluwa O.*, supra, 157 Conn. App. 504. I agree that the record supports the conclusion that the respondent demonstrated only " 'some degree of interest' " in Oreoluwa. Id. The respondent must demonstrate that he maintained a "reasonable degree of interest, concern or responsibility as to the welfare of the child . . . ." General Statutes (Supp. 2016) § 17a-112 (j) (3) (A). On the basis of the court's subordinate

factual findings, which were not clearly erroneous, there was more than sufficient evidence to support the ultimate finding of the trial court that the respondent abandoned Oreoluwa.

The respondent's primary claim on appeal is that the trial court's finding that he abandoned Oreoluwa was improper because abandonment requires that the parent be "at fault." That is, the respondent argues that in order for a court to find that a parent abandoned his child, the record must support a finding that the parent engaged in conduct that rendered the relationship impossible, or that created the separation or lack of parental involvement. It is unnecessary for me to determine whether the respondent's legal theory is correct, because the trial court did make such a finding, and that finding has ample support in the record. As I already have set forth in my initial review of the facts in the present case, the trial court made the factual finding that the respondent and his wife determined that she would travel to the United States alone, when she was seven months pregnant, with the purpose of giving birth to her child here. As I also detail in this dissenting opinion, the record reveals that the mother suffered from mental illness and had a history of postpartum depression. In light of these facts, the respondent's claim that he is without fault is ironic. He chose to risk his unborn child's welfare by remaining home and sending his wife to deliver their child in a foreign country, despite her mental health history. The trial court's findings and the record provide more than sufficient support for the conclusion that the respondent created the separation. His claims to the contrary find no support in the record.

### III

Finally, I address the respondent's claim, which he asserted on behalf of Oreoluwa, that "the guarantee of due process under the fourteenth amendment [to the United States constitution] required the trial court to (1) advise him that he could participate in the termination trial via telephone, video-conference or through the use of reasonable continuances to permit [the] respondent time to review the trial exhibits and transcripts prior to presenting his defense, and (2) take reasonable efforts to use those alternat[ives]." (Internal quotation marks omitted.) *In re Oreoluwa O.*, supra, 157 Conn. App. 507. I agree with the Appellate Court that the respondent lacked standing to raise this claim. Id., 507–508.

"If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. . . . Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it. . . . [A] court lacks discretion to consider the merits of a case over which it is without jurisdiction . . . . The objection of

want of jurisdiction may be made at any time . . . [a]nd the court or tribunal may act on its own motion, and should do so when the lack of jurisdiction is called to its attention. . . . The requirement of subject matter jurisdiction cannot be waived by any party and can be raised at any stage in the proceedings. . . .

"Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . Two broad yet distinct categories of aggrievement exist, classical and statutory. . . . Classical aggrievement requires a two part showing. First, a party must demonstrate a specific, personal and legal interest in the subject matter of the decision, as opposed to a general interest that all members of the community share. . . . Second, the party must also show that the . . . decision has specially and injuriously affected that specific personal or legal interest. . . . Statutory aggrievement exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation." (Citation omitted; internal quotation marks omitted.) *In re Christina M.*, 280 Conn. 474, 480–81, 908 A.2d 1073 (2006).

The respondent argues that our case law supports the conclusion that he has standing to assert a constitutional claim on his child's behalf for a harm that *he* allegedly suffered. The cases cited by the respondent, however, are distinguishable, and provide support only for the conclusion that a parent has standing "to raise concerns *about his or her child's representation*"; (emphasis added) id., 481; or that a child has standing to raise concerns about the fairness of the proceedings terminating a respondent parent's rights. *In re Melody L.*, 290 Conn. 131, 157, 962 A.2d 81 (2009) (children had standing to challenge judgment terminating parental rights of respondent mother), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 746–47, 91 A.3d 863 (2014). In each of those circumstances, the party who was conferred standing would have been unable to assert the subject claims on his or her own behalf. The respondent does not claim that he would lack standing to assert the due process claim at issue in the present case, because he clearly would have standing to do so. The respondent cites to no authority that supports the proposition that a party who undeniably would have standing to assert a constitutional claim on his own behalf nonetheless has standing to assert the same claim on behalf of another. Such a proposition would constitute an unwarranted expan-

sion of our current case law.

For the foregoing reasons, I respectfully dissent.

[1] See footnote 3 of the majority opinion.

[2] As the majority opinion explains, after the release of the Appellate Court opinion, which applied clear error review to all of the trial court's factual findings, we clarified the applicable standard of review. See *In re Gabriella A.*, 319 Conn. 775, 789–90, 127 A.3d 948 (2015); *In re Shane M.*, 318 Conn. 569, 587–88, 122 A.3d 1247 (2015). Consistent with those decisions, I review the trial court's subordinate factual findings for clear error and the ultimate findings for evidentiary sufficiency.

[3] Because the judgment of the Appellate Court may be affirmed on the basis of only one ground for termination and because I conclude that there was sufficient evidence to support the finding that the respondent abandoned Oreoluwa, I need not address the respondent's claim that the trial court improperly found that the petitioner met her burden to prove that there was no ongoing parent-child relationship. See *In re Luis C.*, 210 Conn. 157, 170, 554 A.2d 722 (1989).

[4] The mother previously had been diagnosed with schizophrenia and had been prescribed medication in Nigeria. She also had suffered from postpartum depression following the birth of at least one of her other children. She was not diagnosed with postpartum depression following the birth of Oreoluwa.

[5] Although the respondent was not provided with court-appointed immigration counsel at the hearing on the neglect petition, as he subsequently claimed was his right, the court appointed counsel to represent the respondent in the present case. Ultimately, the respondent's court-appointed counsel referred him to an immigration attorney, whose services the respondent retained.

[6] As to the mother, the petitioner cited three grounds supporting termination of her parental rights: (1) abandonment; (2) no ongoing parent-child relationship; and (3) a prior adjudication of neglect as to Oreoluwa, and the failure of the mother to "achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the child or youth, [she] could assume a responsible position in the life of the child . . . ."

[7] The social study also reports that Turton contacted the department to report that he no longer wished to serve as a resource for Oreoluwa because he believed that the respondent's motives were not in the best interest of Oreoluwa. According to Turton, the respondent was "just trying to use [Oreoluwa's] medical condition in order to secure a visa to this country."

[8] The court's finding that it was the respondent's failure to travel to this country that prevented the department from being able to provide him with services is supported by the extensive services that were provided to the mother during her initial mental health hospitalizations following Oreoluwa's birth and during her brief visit to the United States in August, 2013.

[9] I observe that the present case is the second appeal in the past two years that has raised the question of whether the department should be required to provide immigration services to a noncitizen parent whose child, a citizen of the United States, has been committed to the custody of the petitioner. See *In re Gabriella A.*, 154 Conn. App. 177, 182, 104 A.3d 805 (2014), aff'd, 319 Conn. 775, 127 A.3d 948 (2015). Although the respondent mother in *In re Gabriella A.* did not pursue at this court her claim regarding immigration services, she argued at the Appellate Court that the department had failed to make reasonable efforts to reunify her with the child because the department, inter alia, "terminated the only assistance . . . that [the respondent] was receiving with regard to her immigration status." Id. Such claims are likely to increase in the coming years, suggesting the prudence of a legislative determination of whether and to what extent the department's duty to provide reasonable efforts to reunify a parent with his or her child includes the provision of immigration services to the parent.

[10] I agree with the Appellate Court that it would be improper to consider the extra-record evidence now offered by the respondent to challenge this finding. *In re Oreoluwa O.*, supra, 157 Conn. App. 505 n.10.