**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 39464-2011**

|                                         |   |                                |
| --------------------------------------- | - | ------------------------------ |
|                                         | ) |                                |
| **IN THE MATTER OF THE**                | ) | Boise, March 2012 Term         |
| **TERMINATION OF THE PARENTAL**         | ) |                                |
| **RIGHTS OF:**                          | ) | **2012 Opinion No. 63**        |
|                                         | ) |                                |
| **JOHN (2011-23) DOE,**                 | ) | **Filed: April 26, 2012**      |
|                                         | ) |                                |
| **Respondent-Appellant.**               | ) | **Stephen W. Kenyon, Clerk**   |
|                                         | ) |                                |

Appeal from the District Court of the Third Judicial District of the State of Idaho, in and for Canyon County. The Hon. Brian D. Lee, Magistrate Judge.

The judgment of the magistrate court is <u>reversed</u>.

Jayme Beaber; Coffel & Beaber, P.A.; Nampa; argued for appellant.

Brent R. King, Deputy Attorney General, Caldwell, argued for respondent, Idaho Department of Health and Welfare.

_____

EISMANN, Justice.

This is an appeal from a judgment terminating the parental rights of a Mexican citizen and resident whose child was born in the United States to a citizen of this country on the ground that he had abandoned the child. We reverse the judgment of the magistrate court and remand this case with directions to order the Department of Health and Welfare to promptly deliver the child to her father in Mexico.

## I.

### Factual Background.

John Doe (Father) is a citizen of Mexico who entered the United States illegally in 2003. In mid-2007, he married Jane Doe (Mother) in Payette, Idaho. Father spoke Spanish and Mother spoke English, and they needed an interpreter to converse with each other. After they were married, Father was arrested in Ontario, Oregon, when he attempted to open a bank account with a false social security number. He served three months in jail in Vale, Oregon, and was then

transferred to a jail in Portland to be held for deportation. He agreed to voluntarily leave the United States and did so, returning to his parents' home in Salamanca, Guanajuato, Mexico. Mother also went to Mexico, but she returned to the United States after she became pregnant. Their child (Daughter) was born in the United States in November 2008. Mother also had a four-year-old son by another man. In March 2009, Father reentered the United States illegally in an attempt to be with his wife and Daughter, but he was caught in Arizona and returned to Mexico.

In March, 2009, Mother was living in Middleton, Idaho, with her boyfriend, who had a son who was about seven years old. On March 26, 2009, Mother and her boyfriend took his son to the hospital regarding severe bruising on his head. Because Mother and her boyfriend gave conflicting accounts of how the boy was injured, the medical personnel notified law enforcement. The investigation disclosed Mother's son had struck her boyfriend's son several times with a hairbrush. On March 27, 2009, Daughter and the boyfriend's son were taken into custody by law enforcement, and on the same day the county prosecuting attorney filed a petition under the Child Protective Act with respect to those children. The petition alleged that the name of Daughter's father was unknown and that he was in Mexico at an unknown address.

At the shelter care hearing held on March 31, 2009, Mother and her boyfriend stipulated that there was reasonable cause to believe that Daughter and boyfriend's son were abused and neglected and were therefore within the purview of the Child Protective Act. The children were then ordered to remain in the custody of the Department of Health and Welfare until the adjudicatory hearing.

On April 8, 2009, the prosecuting attorney filed an amended petition under the Child Protective Act. The amended petition added Mother's son as a child within the purview of the Child Protection Act. It alleged that Daughter and boyfriend's son were abused because Mother and her boyfriend should have known that Mother's son was physically and sexually abusing boyfriend's son and failed to protect him and that Mother's son was neglected because his parents were not providing him with necessary medical and behavioral treatment to prevent him from being a danger to others. There were no specific allegations that Daughter had been abused or neglected. The amended petition stated that the name and address of Daughter's father were unknown. On April 24, 2009, the prosecutor filed a second amended petition which added Father's name and his address in Mexico.

2

On May 27, 2009, Mother and her boyfriend appeared in court for an adjudicatory hearing. They stipulated that Daughter and boyfriend's son should remain in the protective custody of the Department. Pursuant to that stipulation, on June 3, 2009, the court entered a decree of protective supervision ordering that Daughter would be in the custody of the Department of Health and Welfare for an indeterminate period not to exceed her eighteenth birthday.

On June 3, 2009, Father spoke by telephone from Mexico with the Department's caseworker assigned to this case. He told her that he would like to be involved in Daughter's life and to be reunited with Mother and her son. He also said he would like Mother to begin the process that would allow him to come into the United States lawfully. The caseworker asked if he would like to take part in the Department's upcoming meeting to make a plan regarding Daughter, and Father stated that he would be available by telephone. That meeting was held the following day, and Father participated by telephone. The Department's purpose for the meeting was to arrive at a plan to reunify Daughter with Mother, the parent from whom Daughter was taken. Because Daughter had not been taken from Father, there was at that point no consideration of having her live with him. During that meeting, Father stated that he wanted Daughter returned to Mother so they could all be a family.

On June 16, 2009, Mother signed the case plan setting forth what she was required to do in order for Daughter to return to Mother's home. Although Idaho Code section 16-1621(3) states, "The plan shall state with specificity the role of the department toward *each* parent" (emphasis added), Father was not named as a participant in the plan, and the plan did not specify any role of the Department toward him. Father was not represented by counsel, nor had he even been made a party to the proceedings.

Father maintained monthly telephone contact with the caseworker to keep apprised of how Mother was progressing with the case plan. During the telephone conversation with the caseworker in July 2009, Father stated that Mother had not called him for about two weeks and that she may be upset because he learned that she was living with another man. He added that she had not been honest with him and wondered if she is still serious about their relationship. He also stated that he was very concerned about Daughter's welfare and would like to have some kind of contact with her. The caseworker responded that she would send him some pictures of daughter. The caseworker did so, but he did not receive them.

During the telephone conversation with the caseworker in August 2009, Father stated that he had talked with Mother over the telephone and she updated him on her progress. When he talked with the caseworker in September 2009, he stated that Mother had called him and was upset. He asked the caseworker if Mother was following the case plan and whether Daughter would be going home soon. The caseworker said there was no definite time period. During the November telephone conversation, the caseworker told Father that Daughter had been given a birthday party on her first birthday and was doing well. The caseworker also said that she would be working to allow Mother to have visitation with Daughter in Mother's home. In a report to the court filed on September 23, 2009, the caseworker wrote: "This worker has been able to speak with [Father] regarding his daughter. [He] would like to have [Daughter] sent to Mexico if [Mother] is not able to work the case plan and reunite with his daughter."

In February 2010, the caseworker informed Father that Mother was not doing what she was supposed to under her case plan, and the caseworker discussed placing Daughter with Father. He said he needed some help in order to keep his daughter, and the caseworker provided him with information to contact a person at the Mexican consulate in Boise. Father was to obtain a home study from the local office of Desarrollo Integral de la Familia (DIF), the Mexican equivalent to the Department. Father tried several times to contact the person, but was not able to talk with him until May 2010.

The next conversation between Father and the caseworker was in June 2010, because the caseworker had been on maternity leave. Father stated he had spoken to the person at the consulate, but that person stated he would have to talk with the caseworker. In July 2010, the DIF worker came to Father's home to conduct an investigation in order to prepare the home study.

On July 27, 2010, the prosecuting attorney filed a petition seeking to terminate Father's and Mother's parental rights in Daughter.[1] Attached to the petition was a report to the court dated July 23, 2010. In that report, the caseworker stated the following regarding Father: "[Father] lives in Mexico he was deported from the United States before [Daughter] was born. This worker speaks with [Father] over the phone monthly regarding how [Daughter] is doing in the foster home. [Father] is interested in having [Daughter] live with him if [Mother] is unable

---

[1] The petition also sought to terminate the parental rights of Mother in her son and the parental rights of her son's father, who was in prison.

to reunify with [Daughter]."  Nevertheless, the caseworker recommended that Father's parental rights be terminated because he "has waited to contact the Mexican Consulate until the month of June 2010."  The report also noted that the foster mother, who was a Department employee, and the foster father were willing to provide Daughter with a permanent home.

In August, the Department's caseworker told Father she would present the home study to the court if it was received in time.  On September 15, 2010, the Mexican consulate emailed the report to the caseworker.  The report stated that Father was financially, emotionally, physically, and mentally able to provide for Daughter, that his home would be a suitable placement for Daughter, and that DIF would provide services to Father if Daughter were placed with him.

The termination hearing was held on September 29, 2010.  At that hearing, the Department did not present the DIF report to the court.  The caseworker testified that she disregarded the report because the Department had decided to terminate Father's parental rights.  Thus, default was entered against Father, even though he had clearly not been properly served with process regarding the termination proceedings.  On August 31, 2010, the prosecutor had obtained from the clerk of the court an order stating that Father's last known address was in Mexico and that he could be served by publication in a newspaper that had general circulation in Canyon County, Idaho.  Obviously, service by publication in Canyon County was not intended to give Father any notice of the termination proceedings.  On November 2, 2010, the court entered a judgment terminating Father's parental rights in Daughter.  A judgment was also entered terminating Mother's parental rights.

Father ultimately obtained counsel and on February 24, 2011, his attorney filed a motion to set aside the default judgment.  The prosecuting attorney resisted the motion, but after a hearing the magistrate court entered an order setting aside the judgment on the ground that there was no proper service.  The matter was then tried on July 6 and 27, 2011.  On December 7, 2011, the court entered a decree holding that Father had abandoned Daughter, that it would be in her best interests to remain in Idaho, and that Father's parental rights were terminated.  Father then timely appealed.

## II.

### Are the Court's Findings Supported by Substantial and Competent Evidence?

5

A court may grant a petition to terminate a parent-child relationship if the parent has abandoned the child and termination of the parental rights is in the child's best interests. I.C. § 16-2005(1)(a). " 'Abandoned' means the parent has willfully failed to maintain a normal parental relationship including, but not limited to, reasonable support or regular personal contact." Idaho Code section 16-2002(5). "Failure of the parent to maintain this relationship without just cause for a period of one (1) year shall constitute prima facie evidence of abandonment under this section . . . ." *Id.* "No universally applicable 'normal parental relationship' exists; whether such relationship exists depends on the circumstances of each case." *In re Adoption of Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006).

"The petitioner holds and retains the burden of persuasion to show that abandonment has occurred. This includes a showing that the defendant parent is without just cause for not maintaining a normal relationship with the child." *Id.* at 192, 141 P.3d at 1061. Whether a matter has been proved by clear and convincing evidence is primarily a matter for the trial court. *Hogg v. Wolske*, 142 Idaho 549, 554, 130 P.3d 1087, 1092 (2006). "On appeal, the appellate court does not reweigh the evidence to determine if it was clear and convincing." *Dep't. of Health and Welfare v. Doe*, 149 Idaho 207, 210, 233 P.3d 138, 141 (2010). "Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion." *Anderson v. Harper's, Inc.*, 143 Idaho 193, 195, 141 P.3d 1062, 1064 (2006).

**Abandonment.** "[T]he willful failure to maintain a normal parental relationship can be based upon either the failure to pay reasonable support, or the failure to have regular personal contact, or some other failure." *Doe I v. Doe II*, 148 Idaho 713, 715, 228 P.3d 980, 982 (2010). The magistrate found that Father had abandoned Daughter because he had failed to pay support and had failed to have regular personal contact with Daughter.

The magistrate court found that Father "made no attempt to establish a relationship by the means that were available to him. [He] sent no letters, cards or gifts to [Daughter] through her custodian, IDHW [Idaho Department of Health and Welfare], despite the fact that he knew IDHW was capable of translating and delivering any such letter, card or gift to [Daughter]." This finding by the magistrate is clearly erroneous. In fact, it is absurd.

Mother left Mexico when she was pregnant. Father was a citizen of Mexico and the uncontradicted evidence was that he could not have come legally into the United States without Mother filing the appropriate documents to petition on his behalf. Mother did not do so. After

6

Father was caught entering America illegally in 2009, he was barred from even petitioning to enter the country for ten years. 8 U.S.C. 1182(a)(9)(C)(i). When Daughter was ordered into the protective custody of the Department, she was seven months old. Having someone read letters to her from Father would not in any way create a parental relationship of any kind. Even by the time of trial, when she was two and one-half years old, reading letters from Father to her would not have helped develop a parental relationship. In fact, neither the Department nor the foster parents even told her who her Father was. By the time of the trial, Daughter was calling the foster father "Daddy." There is no way that Father could develop any relationship with Daughter without having personal contact with her, and that was not possible as long as Daughter was in the United States.

The magistrate judge also found that Father had abandoned Daughter because he "sent no support to Maria of any kind." The only evidence of Father's income was that he worked two to three days a week and that his salary was 800 to 900 pesos. Nine hundred pesos would be about $70.30. He lives in his parents' house with his sister, and they all work and contribute to provide support for those in the household. To determine a parent's ability to pay support for a child, the court must consider both the parent's income and the parent's living expenses. *In re Adoption of Doe*, 143 Idaho 188, 192, 141 P.3d 1057, 1061 (2006). The magistrate stated, "While the evidence shows that [Father] is a man of modest means, the record does show and this court finds that [Father] has been employed during the course of this case and that he has used those resources in the support of himself and his family in Mexico." That was the entire finding regarding Father's ability to have paid support for Daughter. There was no finding as to how much of Father's income was required for his share of the living expenses. Absent such evidence, the magistrate's finding that he could have provided some support to Daughter was clearly erroneous.

In order to prove that Father had abandoned the Daughter, the prosecutor had to prove by clear and convincing evidence that he had "*willfully* failed to maintain a normal parental relationship" with the children. I.C. § 16–2002(5) (emphasis added). "For one to willfully fail to do something, he or she must have the ability to do it." *Doe I v. Doe II*, 148 Idaho 713, 716, 228 P.3d 980, 983 (2010). There was no evidence that Father had the ability to establish any relationship with Daughter as long as she was in the custody of the Department and he was in Mexico, legally barred from entering the United States. Likewise, there is no evidence that he

had the ability to pay support.  Throughout the proceedings under the Child Protective Act and these proceedings, Father has consistently expressed the desire to have custody of Daughter, and he did all that he could do for that to happen.

In her report to the court, the caseworker stated that Father's parental rights should be terminated because he "has waited to contact the Mexican Consulate until the month of June 2010."  He was told in February that the Department would consider placing Daughter with him and that he needed to contact a specific person at the Mexican consulate in Boise.  He testified that he called the consulate several times, but was not able to make contact with that person until May.  The caseworker herself testified that when she called the consulate and left a message asking that person to call her, it was a month before he did.  The assertion that Father's parental rights should be terminated because it took him three months of trying before he was able to contact the person at the Mexican consulate certainly seems pretextual.  It makes one wonder whether the real reason for seeking termination of Father's parental rights is the fact that a Department employee wanted to adopt Daughter.

**Best interests of Daughter**.  The magistrate found that it was in Daughter's best interests to have Father's parental rights terminated so that she can be adopted by persons who can and will provide her with the guidance, care, and support that she has not had in Mother's custody.  The court further found that it was contrary to her best interests  "to be introduced at this late hour to the home of her father."   The court stated that Daughter "has no relationship with [Father] or any other tie to Mexico whatsoever. The only home [Daughter] has ever known is Idaho and she is currently being well cared for and has bonded with her foster family in a pre-adoptive placement."  This finding is clearly erroneous.

In making this finding, the magistrate court failed to recognize the significance of a parent's rights regarding his or her child.  "A parent has a fundamental liberty interest in maintaining a relationship with his or her child." *In re Adoption of Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006).  In *Stockwell v. Stockwell*, 116 Idaho 297, 299, 775 P.2d 611, 613 (1989), we stated as follows:

> In custody disputes between a "non-parent" (i.e., an individual who is neither legal nor natural parent) and a natural parent, Idaho courts apply a presumption that a natural parent should have custody as opposed to other lineal or collateral relatives or interested parties. This presumption operates to preclude consideration of the best interests of the child unless the nonparent demonstrates either that the

8

natural parent has abandoned the child, that the natural parent is unfit or that the child has been in the nonparent's custody for an appreciable period of time.

That same presumption applies here. There is no contention that Father abused or neglected Daughter, nor is there any contention that he is unfit to have her custody. Although the Department had custody of Daughter for slightly over two years by the trial date, that was not through any fault of Father. He could not lawfully enter the United States, and for almost two years of that time he was not even represented by counsel. He repeatedly expressed the desire to be with Daughter, and he did all that the Department told him to do in an attempt to obtain her custody. He was ultimately prevented from obtaining custody simply because the Department decided that Daughter should remain in the United States. Absent evidence that Father was unfit to have custody of Daughter, it was in Daughter's best interests to be placed with him once it was determined that Mother was unable to successfully complete her case plan.

Another Department employee testified: "I think it's in the best interest of [Daughter] obviously to remain in the United States because there's no comparison between being in Mexico and being in the United States, being a United States citizen. She has all the luxuries or all the things that we can offer." The fact that a child may enjoy a higher standard of living in the United States than in the country where the child's parent resides is not a reason to terminate the parental rights of a foreign national.

## III.

### Conclusion.

We reverse the judgment of the magistrate court and remand this case with instructions for the court to order the Department to take all reasonable steps to promptly place Daughter with Father in Mexico.

Chief Justice BURDICK, Justices J. JONES, W. JONES, and HORTON **CONCUR.**

9