## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 47789

| | |
|---|---|
| In the Interest of:<br>Jane Doe I and John Doe II,<br>Children Under Eighteen (18) Years of Age.<br>(2020-10)<br>------------------------------------------------------<br>STATE OF IDAHO, DEPARTMENT OF<br>HEALTH AND WELFARE,<br><br>   Petitioner-Respondent on Appeal,<br><br>and<br><br>JOHN DOE,<br><br>   Respondent,<br><br>v.<br><br>GUARDIAN AD LITEM, and FOURTH<br>JUDICIAL DISTRICT CASA PROGRAM,<br><br>   Appellants on Appeal. | Boise, May 2020 Term<br><br>Opinion Filed: July 9, 2020<br><br>Melanie Gagnepain, Clerk |

Appeal from the Magistrate Court of the Fourth Judicial District of the State of Idaho, Ada County. Andrew Ellis, Magistrate Judge.

The order of the magistrate court is vacated.

Christine Salmi, Perkins Coie, Boise, for appellants.

Randall Barnum, Barnum Law, PLLC, Boise, for respondent, John Doe.

Lawrence G. Wasden, Idaho Attorney General, John Shackelford, Deputy Attorney General, Boise, for respondent, IDHW.

_____

STEGNER, Justice.

This case arises from an appeal by a guardian ad litem (GAL) for two minor children after a magistrate court determined that the children should be placed with their biological father

1

in Mexico. Jane Doe I (Daughter) and John Doe II (Son) were removed from the care of their mother (Mother) along with another half-sibling on April 18, 2018, after a preliminary investigation revealed the children were homeless and living in a car. At the time Daughter and Son were taken into foster care, the specific whereabouts of their biological father, John Doe (Father), were unknown, other than that he had been deported to Mexico in December 2014. Father had last seen the children at that time. In addition, his paternity had not yet been established and he had not had any contact with his children since his deportation.

A little more than a year after the proceedings had begun, Father's paternity was established. Shortly after the Department filed the amended petition, it sought a case plan for Father. The Department also attempted to obtain a home study for Father but faced difficulty accomplishing this task because he lived in Mexico. The children's GAL opposed placing the children with Father without more information about him and his living situation. Ultimately, the magistrate court ordered that the children be placed with Father as soon as possible without a home study being conducted, apparently relying on *In re Doe*, 153 Idaho 258, 281 P.3d 95 (2012). On motions to reconsider filed by the Department and the GAL, newly-discovered evidence was presented that Father was a registered sex offender who had previously pleaded guilty to failing to register as such. Nevertheless, the magistrate court denied the motions to reconsider. The GAL appealed. For the reasons set out below, we vacate the magistrate court's Amended Conditional Order to Vacate Legal Custody and Dismiss Child Protective Case as to Daughter and Son, and the Order for Placement Outside United States of America as to Daughter and Son.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Removal of Daughter and Son from Mother's custody and early proceedings.

Daughter was born in 2011; Son was born in 2013. Both were born in Boise and are consequently native-born citizens of the United States. The record does not reveal the extent of Mother's relationship with Father, other than that there was apparently no contact between the two following Father's deportation. According to Father, he came to the United States at the age of two and grew up in the Midwest. Evidently, Father has been deported twice, most recently on December 19, 2014. He has resided in Mexico since his most recent deportation.

On April 18, 2018, Daughter, Son, and their eight-month-old half-sister (A.P.) were taken into custody under the Child Protective Act. This was initiated by a referral from a worker at the

daycare facility the children attended. The referring party noted that Daughter had had fifty absences and sixty tardies at her school. She also had a visible cavity in her tooth and reported experiencing pain when she ate. Son had rotting teeth and swollen, painful gums, for which Mother had not sought proper medical or dental attention. Mother had directed the daycare to give him adult doses of ibuprofen and acetaminophen, despite his young age. A.P. also had symptoms of thrush which had persisted for approximately six months, and for which Mother had not sought medical assistance. A.P. was frequently sent to the daycare with bottles that smelled of rotten milk. In addition, Son revealed that Mother and the children had been "kicked out" of the house where they had been staying, and were living in Mother's car. The children had also frequently complained of not having enough food to eat or a bed in which to sleep. Accordingly, the children were declared to be in imminent danger by law enforcement.

The three children were first placed in a foster home with a non-relative, but were moved to the care of their maternal aunt in July 2018. They remained there until April 2019, when their aunt told the Department she could no longer care for the children. The children were then relocated to the home of A.P.'s paternal grandmother (Grandmother), who indicated she wanted to be a permanency option for A.P. The children have remained in Grandmother's care throughout these proceedings. Daughter and Son also visited Father's mother, who resides in the vicinity, regularly on the weekends.

In May 2018, a guardian ad litem (GAL) was appointed for all three children.[1] The GAL submitted regular reports regarding the three children, who apparently thrived in the care of their foster family.

Meanwhile, Mother made little progress on her own case plan. At first, the primary hurdle was Mother's inability to secure housing. However, other issues arose; for example, her employment became inconsistent for a period of time. After her housing became more stable, she was granted overnight visits with Son and Daughter, but a series of urinalysis tests revealed heavy alcohol use and trace amounts of methamphetamine. She was working in a nightclub as a dancer, and purportedly drank heavily on the job.

During an October 2018 permanency hearing, the magistrate court observed that Mother

---

[1] At the outset of the proceedings, the magistrate court appointed the Fourth Judicial District Court-Appointed Special Advocate (CASA) Program as the GAL. The Fourth District CASA Program then identified an individual who would serve as the GAL for all three children. The individual GAL was then appointed by the magistrate court to replace the Fourth District CASA Program and to fulfill that obligation going forward.

3

was not doing well on her case plan, and asked the Department's representative if she had been able to establish contact with Father. (The father of A.P. was incarcerated locally and participated in proceedings involving A.P. in-person after being transported to the Ada County Courthouse.) The social worker stated that she had a phone number for Father but had not been able to make contact with him. The magistrate court directed the Department to follow up, expressing concern that there might "be a hold [on finding a permanent home for the children] because of paternity."

Accordingly, the Department spearheaded an effort to involve Father in the case, beginning with establishing his paternity of Daughter and Son. By March 2019, the Department had initiated contact with the Mexican Consulate to set up DNA testing of Father. The Department also assisted Father and Mother by coordinating his signing of affidavits acknowledging paternity of Daughter and Son.

**B. Father's involvement in the case.**

On July 1, 2019, the Department filed a third amended petition for hearing; attached were two Acknowledgement of Paternity Affidavits and birth certificates for Daughter and Son. Daughter's original birth certificate had initially been filed with the State on March 24, 2011, about two weeks after her birth. Son's original birth certificate had been filed with the State after his birth in October 2013, but was amended February 10, 2014.[2] Both birth certificates attached to the amended petition had apparently been re-issued on June 7, 2019, to identify Father's paternity. On April 16, 2019, prior to the issuance of the most-recent birth certificates, Mother signed two separate affidavits of paternity for both Daughter and Son in which she identified Father as the biological father of both children. In the Department's progress report—filed the next day on July 2, 2019—the Department requested additional time to complete a home study of Father's living conditions in Mexico.

On July 10, 2019, a permanency hearing was held. For the first time during the pendency of these proceedings, Father participated by telephone, calling in from Mexico. The magistrate court asked several questions about Father's living situation. Father stated he was living with his paternal grandmother and aunt in a four-bedroom house. There was general confusion about how to start the home study process, with the Department and Father suggesting that he needed a court order for a home study. The magistrate court stated that it was "grant[ing] that the [case]

---

[2] This amendment was to correct Mother's birth date on the certificate.

plan will include a goal of ongoing efforts toward reunification" with Father, "primarily . . . to give [him] the opportunity to work with the agency there in Mexico, to do a home study and to have it be determined whether or not it would be appropriate for [Daughter] and [Son] to be placed in your home with you in Mexico." The magistrate court remarked that it was "putting all of [its] eggs in [Father's] basket[.]"

On September 30, 2019, the GAL filed his report in anticipation of the six-month review hearing. The GAL observed that, independent of each other, Daughter and Son had both expressed their wish to live with Father in Mexico. Nevertheless, the GAL presented significant concerns about moving Daughter and Son to Mexico. These concerns involved language barriers, culture shock, the children's U.S. citizenship, educational opportunities for English-speaking children in a Spanish-speaking country, and the consequences of separation from their half-sister, A.P. Further, the GAL pointed out that Father's lifestyle and employment had not been verified. The GAL concluded by recommending that the children remain in their foster placement until more could be learned about the conditions under which Daughter and Son would live upon relocating to Mexico.

According to a Department progress report filed October 3, 2019, a request had been made to *Desarrollo Integral de la Familia* (*DIF*), the Mexican agency responsible for conducting home studies. The Department had kept in monthly contact with Father, and noted that he said he worked as a security guard in a commercial building. The progress report observed that

> Father remains vigilant in his communication with the Department to receive updates as to his children. [He] has been cooperative, engaging and pleasant throughout the process and continues to keep his focus on his children's best interest.
>
> . . . .
>
> [Father] has maintained regular contact for several months with the Department making attempts to establish paternity for his children. [Father] had been involved with his children's lives until his deportation. [Father] expresses his love and concern for his children and anguishes over the fact he is limited on his ability to be a hands-on parent. [Father] attempts to have weekly communication, but expresses limitations the distance and phone contact provides. [Father] is thoughtful in what he wants for his children's future, discussing parenting practices, his belief in day-to-day care for his children and what his involvement would look like in the event he can reunify with them. [Father] is proactive and follows through with his statements to ensure for the children's safety and well-being. [Father] expresses his desire for the children to be with their mother, but understands if she is unable to care for them, he wants to provide for their care.

5

On October 11, 2019, a six-month review hearing was held. Father again participated from Mexico by telephone. At the hearing, there was apparent confusion about what *DIF* needed in order to conduct a home study, with Father indicating again that he needed the magistrate court to order one, and a representative of the Department asserting that a document authorizing a home study had already been forwarded. The Department contended that there was a "wait list" for a home study to be performed by *DIF*, apparently because of high volume.

At this hearing, the magistrate court posed "a potentially radical question, which is, why do we need a home study?"

> We're all familiar with what we need to do to move a child within the states in Idaho – or in the United States. We obviously have to comply with the Interstate compact for the placement of children [ICPC], but this is not a move to another state. This is a move to another country, and the ICPC does not apply, so are we waiting on a home study simply so that the Department feels comfortable to move, or is there some policy or procedure that prevents us from placing the children with Dad tomorrow?

The magistrate court reasoned that "we do home studies to comply with the ICPC [Interstate Compact on Placement of Children], but in this case" the ICPC does not apply. "I think we're trying to do a home study to see and determine if [Father] is a fit parent, and that's not the purpose of a home study. We have to presume that he is a fit parent." The magistrate court then inquired about the issue of the children's passports and asked what other legal roadblocks, such as visas, would keep Daughter and Son from being sent to Mexico. The magistrate court wanted these outstanding questions answered by the next status hearing.

On November 11, 2019, counsel for the GAL filed a memorandum, arguing that an investigation into Father's care should be conducted, even if a formal home study was not expressly required by statute. The GAL reasoned that the court and the Department were statutorily bound to consider whether any placement would serve the best interests of the children. The GAL pointed out that there was no evidence showing that Father had adequate employment or a safe living space. Accordingly, the GAL requested that the magistrate court ensure that adequate steps be taken to conduct an investigation about Father before entering an order sending the children to Mexico. The GAL also filed a review report reiterating his concerns and reservations regarding simply relocating the children to Mexico.

The next status hearing was held on November 18, 2019. The court asked Father about any updates on the home study, and Father answered that *DIF* had told him that a home study

"could take up to three to six months, maybe, two months." When the magistrate court asked the Department about moving the children to Mexico, the Department asserted that there were "no legal barriers to . . . just sending the children at this point to Mexico[.]" However, the Department reiterated that

> the Department standards are to do what's in the best interest of the child. Where [Father] has been deported, from what we understand, for warrants and driving while suspended and that the children have not visited with him since he has been deported, I think there is that obligation from the Department to ensure that he is a fit parent before sending the children to Mexico[.]

In response, the magistrate court expressed concern about how long it would take to get the home study done in Mexico: "[M]y cynical gut feeling is that we'll be back in six months and we'll be getting word that another three to six months, they'll be another three to six months." The magistrate court reiterated that "the obligation is not for us to prove that [Father] is a fit parent, but rather, the state's obligation is to demonstrate that he is an unfit parent." When counsel for the GAL suggested that the Department itself send someone to conduct a home study in Mexico, the magistrate court pointed out that it did not think the Department would fund that. The Department agreed, stating that "[d]oing a home study in a Mexico would constitute" practicing social work outside Idaho. Counsel for the GAL requested at least a few more months to see if *DIF* was able to conduct the home study in Mexico. Nevertheless, the magistrate court stated he wanted to have the children placed with Father at the end of the year so that they could start school after the holidays.[3]

On December 18, 2019, counsel for the GAL moved the magistrate court to take judicial notice of the additional legal documentation required before the children could be moved to Mexico. The GAL expressed significant concern about the lack of resident visas or permits for the children, as well as their lack of Mexican citizenship. The GAL requested that the magistrate court consider and resolve these concerns before simply sending the children to Mexico.

A review hearing was held the next day on December 19, 2019. The Department expressed frustration that the children's passports had not yet arrived. The magistrate court noted that the GAL's motion raised an issue he had not yet thought about, namely that visas might be required. Counsel for the GAL reiterated that the primary consideration should be the best interest of the children: "[T]here's [sic] a lot of questions here, but I think we owe it to these kids

---

[3] However, there is no evidence in the record regarding what, if any, educational opportunities would be available for two English-speaking, school-age children in a Spanish-speaking country.

to find out answers to those questions before we're sending them off to the border." The magistrate court noted a recent Idaho Supreme Court case in which the Court had reversed a father's termination of parental rights and remanded the case with direction to place the child in Mexico "as promptly as possible."[4] "I don't want to be on the receiving end of one of those opinions from the Supreme Court, so we need to get these children down to their father as soon as is possible to do so."

On January 27, 2020, another status hearing was held. By this time, the children's passports had arrived, and the Department reported that it had been advised the children would be able to obtain dual citizenship soon after they reached Mexico, suggesting that no visas would be required. The magistrate court approved an order which would authorize out-of-country placement with Father, and a conditional order to vacate and dismiss the case once the children arrived in Mexico.

### C. New information comes to light about Father.

On February 7, 2020, the Department moved the court to reconsider the children's placement outside the United States. This was premised on newly discovered evidence that Father had a criminal history in the United States. The primary concern was the Department's contention that Father was required to register as a sex offender. Records showed the following convictions:

- An incident in Walworth County, Wisconsin, on May 26, 2000, the correction action for which was to require registration as a sex offender;
- Felony failure to register as a sex offender in Walworth County, Wisconsin on September 13, 2006;
- Fugitive to Idaho in Ada County, Idaho on July 16, 2006 (dismissed September 7, 2006);
- Possession of drug paraphernalia and marijuana, and a probation violation in Ada County, Idaho on July 11, 2008;
- Resisting or obstructing officers and a driver's license violation in Ada County, Idaho on January 25, 2011;
- Providing false information about identity to an officer in Ada County, Idaho on

---

[4] The magistrate court was apparently referring to *In re Doe*, 153 Idaho 258, 265, 281 P.3d 95, 102 (2012). This case will be referred to as *Doe-2012* in this opinion.

February 24, 2011;

- Probation violation in Ada County, Idaho on April 26, 2011;

- Inadmissibility under Section 212 of the Immigration and Nationality Act (INA) on May 11, 2011;

- Resisting or obstructing an officer, providing false information about identity to an officer, and disturbing the peace in Ada County, Idaho on April 27, 2015;

- Probation violation in Ada County, Idaho on April 27, 2015; and

- Illegal re-entry under the INA after being removed on August 25, 2016.

The GAL also joined the Department's motion to reconsider. Personnel from the Fourth Judicial District Court-Appointed Special Advocates (CASA) Program also filed a declaration in support of the motion to reconsider, detailing the GAL's efforts in locating Father's criminal history. An email from a Wisconsin police department was attached, casting confusion as to whether the charges in Wisconsin had in fact resulted in a conviction.

An emergency hearing on the motion to reconsider was held on February 10, 2020. The Department relied on the email from the Wisconsin police department to point out that Father "wasn't convicted" of either charge, which "was something that happened when he was a minor[.]" Counsel for the GAL pointed out that the inconsistencies between the records and the email—which revealed that Father had come into the Wisconsin police department twice to register—raised serious questions that needed answers before the children were transported to Mexico and jurisdiction would be forever lost.

The magistrate court observed that the record was "all very murky" before proceeding:

> I think I am comfortable stating from the record that [Father] was convicted after pleading guilty in 2006 to "failing to register as a sex offender in the State of Wisconsin."
>
> I would hope that no judge anywhere in this country would accept a guilty plea unless they had assurances and a record that the crime had been committed, and so on one hand, I am inclined to believe that [Father] was required under the law to register as a sex offender, failed to do so, and was rightfully convicted in 2006.
>
> . . . .
>
> Where the rubber meets the road for me, where it comes down to allegations of a sex offense, is that if the state and the guardian could show and present evidence here today that [Father] was convicted as an adult of a crime of a serious sexual nature against a minor child, roughly the age of [Daughter] or [Son], then, I would be deeply troubled and concerned about the prospect of returning two children to someone with a history that may indicate that the

9

children would be at risk of sexual offending.

> I don't have that evidence. At most, I have some evidence that there was a conviction for something, and [counsel for Father] led me to believe that it was some offense he committed as a 12-year-old[.]

Counsel for the GAL expressed concern as to how much information had not been located because the Department had apparently not looked for it. "[T]he presumption that the court . . . was affording [Father] as a fit parent because he was the biological parent . . . applies only when there is no evidence to the contrary, and I think we do have evidence to the contrary."

The magistrate court denied the motion to reconsider. First, the magistrate court underlined the fundamental right of a parent to raise his children. The magistrate court stated that it was required to "presume that [Father] is fit, and there is a presumption that fit parents act in the best interest of their children, and, therefore, I trust that [Father] will act in [Daughter's] and [Son's] best interest and make sure that they are well cared for in their new home in Mexico."

The GAL appeals from the magistrate court's decisions.

## II.    STANDARD OF REVIEW

"This [C]ourt exercises free review over the lower court's conclusions of law." *Doe (2016-34) v. Doe*, 162 Idaho 254, 256, 395 P.3d 1287, 1289 (2017) (alteration in original) (quoting *Barry v. Pac. W. Constr., Inc.*, 140 Idaho 827, 831, 103 P.3d 440, 444 (2004)). "This Court also 'exercises free review when interpreting the meaning of a statute.'" *Id.* (quotation omitted).

> This Court will not set aside findings of fact unless they are clearly erroneous. I.R.C.P. 52(a); *Halen v. State*, 136 Idaho 829, 832, 41 P.3d 257, 260 (2002). If the trial court's findings of fact are based upon substantial and competent, although conflicting evidence, they should not be disturbed on appeal. *Id.* at 832, 41 P.3d at 260.

*Doe I v. Doe*, 138 Idaho 893, 906, 71 P.3d 1040, 1053 (2003).

## III.    ANALYSIS

The magistrate court's reasoning in the January 27, 2020, status hearing at which it ordered placement of Daughter and Son with Father is sparse. However, its reasoning appears more fleshed out in the hearing conducted on December 19, 2019. In response to concern voiced by counsel for the GAL regarding the "best interest of the children," the magistrate court specifically relied on *Doe-2012*, 153 Idaho at 258, 281 P.3d at 95.

At the hearing on the motion to reconsider, the magistrate court found that Father had been convicted of failure to register as a sex offender in the state of Wisconsin. Notwithstanding

this finding, the court reasoned that, because of the presumption that Father was fit, the burden was still on the State and the GAL to

> show and present evidence . . . that [Father] was convicted as an adult of a crime of a serious sexual nature against a minor child, roughly, the age of [Daughter or Son], then, I would be deeply troubled and concerned about the prospect of returning two children to someone with a history that may indicate that the children would be at risk of sexual offending.
>
> I don't have that evidence. At most, I have some evidence that there was a conviction for something, and [counsel for Father] led me to believe that it was some offense he committed as a 12-year-old, and, I, for one, fall firmly into the camp that people change, people mature and that we should not hold the sins of a child against them as an adult.

The magistrate court returned to the issue of a home study, observing:

> I fully understand and appreciate the Department of Health and Welfare, and the state and the guardian's hesitancy, and outright opposition, to returning these children to their father based on our inability to get a home study accomplished in the country of Mexico that would provide us with information, vital, important information, that would make us feel a whole lot better about the fate of [Daughter] and [Son] being returned to their father.
>
> I too would love to have had that information, but I believe my role as judge is to follow the law, and the United States Supreme Court in a string of cases has held that it is a fundamental right of parents to raise their children, and the only way that the state gets to intervene in the fundamental right of parents raising their children is if there can be a demonstration by the state of the unfitness of the parent.

The magistrate court turned again to *Doe-2012* when it noted "a number of cases where judges have been soundly reprimanded by the appellate courts for unfairly shifting the burden of proving fitness to parents, and that I believe is what is being asked of me here[.]" "I must presume that [Father] is fit[.]" Operating under this presumption, the magistrate court did not analyze whether it was in the best interest of Daughter and Son to transport them to Mexico to be with their father.

The GAL argues that, even recognizing that Father is entitled to the presumption that he is a fit parent, once an allegation questioning Father's fitness has been made, which is supported by evidence, the magistrate court should have undertaken an analysis to determine whether the presumption had been overcome. Father argues that the evidence contradicting the presumption of fitness must be clear and convincing to overcome this presumption. Father also maintains that the evidence presented regarding his criminal history is "contradictory" and "over 14 years old[,]" and cannot reach a level adequate to rebut the biological parent's presumption.

11

In custody disputes between a "non-parent" (i.e., an individual who is neither legal nor natural parent) and a natural parent, Idaho courts apply a presumption that a natural parent should have custody as opposed to other lineal or collateral relatives or interested parties. This presumption operates to preclude consideration of the best interests of the child unless the nonparent demonstrates either that the natural parent has abandoned the child, that the natural parent is unfit or that the child has been in the nonparent's custody for an appreciable period of time.

*Doe-2012*, 153 Idaho at 265, 281 P.3d at 102 (quoting *Stockwell v. Stockwell*, 116 Idaho 297, 299, 775 P.2d 611, 613 (1989)).

Such proof requires a showing of clear, satisfactory, or convincing evidence that the parent is patently unfit or has abandoned his child, or as in the factual situation at bar, where an adverse party has custody of the child for an appreciable period of time (in excess of three years), the best interests of the child dictate custody being placed with the adverse party if the facts show he is better fitted to raise the child than the natural parent.

*Ewing v. Ewing*, 96 Idaho 424, 426, 529 P.2d 1296, 1298 (1974) (footnotes omitted).

As a preliminary matter, this Court has applied the biological parent's presumption regardless of the citizenship status of the parent. *See Doe-2012*, 153 Idaho at 265, 281 P.3d at 102. The GAL has asked us to reverse course from *Doe-2012* and conclude that Father is not entitled to the constitutional rights found in the law because he is not a citizen. We find it unnecessary to address this issue because, even assuming the magistrate court properly afforded the biological parent's presumption to a non-citizen, the magistrate court erred in its application of the presumption.

While we recognize that the magistrate court correctly began its analysis with the presumption that custody in Father's care was in the best interests of the children, the magistrate court should not have ended its analysis at this presumption in the way it did. In effect, the magistrate court *concluded* Father was entitled to custody. In this regard, the magistrate court erred in two critical ways. First, the magistrate court erred as a matter of law in relying on *Doe-2012* as justification for its decision. *Doe-2012* does not stand for the proposition that the biological parent's presumption of fitness allows a magistrate court and Department to dispense with due diligence and consideration of the health and safety of the children under their purview. *Doe-2012* involved a case in which this Court applied the presumption of fitness to a parent even though that parent resided outside the United States. *Doe-2012*, 153 Idaho at 265, 281 P.3d at 102. However, regardless of whether a parent resides outside the United States, the policies

underpinning the Child Protective Act continue to apply. The biological parent's presumption of fitness does not in any way diminish the diligence due in ensuring the safety of children who come within its ambit.

The primary policy consideration of the Child Protective Act is "the health and safety of the child[.]" I.C. § 16-1601. When a parent seeks custody of children who have not been in his custody and care for an appreciable period of time, it is vital that the court recognize the primary obligation to ensure the children's safety. This consideration is especially important when placing children outside the United States, because once a court makes that determination, it is thereafter dispossessed of jurisdiction. In other words, the court may never revisit or alter such a custody decision, unless the children are returned to the United States. The outcome under these circumstances is neither dynamic nor fluid, it is forever final. As a result of the loss of jurisdiction, it is incumbent on the trial court to determine and resolve the facts. Where a "red flag" has been waved, it is necessary to determine whether a proposed disposition, even to place a child or children with a biological parent, would put those children in harm's way. While it is true that the Interstate Compact on Placement of Children does not govern placements made out of country—and therefore does not *mandate* a home study—the responsibilities of a court and the Department to ensure fitness do not end with application of the presumption of fitness.[5] *Doe-2012* does not stand for the proposition that a home study is unnecessary simply because the placement will be outside the United States. Where the Department requested sufficient time to conduct a home study, the court after having recognized the need for one should not have proceeded in the absence of one. Nor is there anything in *Doe-2012* which stands for the proposition that a judge may disregard evidence that raises questions about the safety of children. Where the GAL raised concerns about what had not been discovered because the Department had not looked for it, the magistrate court should have provided sufficient time for a thorough investigation.

Second, the GAL and the Department presented sufficient evidence to call into question the presumption of Father's fitness.[6] The magistrate court seemed convinced that, barring

---

[5] As distinct from the facts in this case, in *Doe-2012*, there was no contention that the father had neglected his daughter, a home study *was* conducted, and the father *had* been found to be a fit parent. *Doe-2012*, 153 Idaho at 263, 281 P.3d at 100.

[6] Father has argued that, in order to trigger a "best interests" analysis as to the children's placement, the GAL should have presented "clear and convincing evidence" of unfitness. (Citing *Stockwell*, 116 Idaho at 299, 775 P.2d at 613).

13

evidence that Father's sex offender status involved crimes against children similarly aged to his own children, his sex offender status could not overcome the presumption that Father was a fit parent. The court also seemed to minimize the underlying sex offense because it purportedly happened when Father was a minor. These are not findings that are supported by substantial and competent evidence. An individual may be required to register as a sex offender for a wide variety of offenses ranging from less significant to extreme. Without information about the underlying criminal offense requiring Father to register as a sex offender, it was incumbent on the magistrate court to allow sufficient time for diligent investigation, and not rush to dispossess the court of jurisdiction by placing the children in Mexico. While there may be a benign explanation for Father's criminal history, at the very least, the magistrate court should have recognized that answering the outstanding questions about Father's criminal history was more important than ensuring the quick and permanent transfer of Daughter and Son. The magistrate court should have vacated its order for placement and its order to vacate legal custody and dismiss the child protective case, and allowed for an evidentiary hearing to determine if the presumption had been overcome.

Finally, we also note that the third amended petition filed by the Department raised multiple serious concerns unrelated to Father's criminal history, which were not addressed. The Department alleged that the children had been "without proper parental care and control, or subsistence, medical or other care and control necessary for their well-being[.]" The Department also contended that "the children's parents failed to provide a stable home environment[,]" and were "unable to discharge their responsibilities to and for the children, and as a result of such inability, the children lack the parental care necessary for their health, safety, or well-being[.]" Despite these significant allegations, the Department was never allowed to put on proof of Father's alleged shortcomings to ensure that Father *was capable* of providing a stable home environment or discharging his parental responsibilities.[7]

Further, the information about Father's criminal history was discovered not by the

---

This is not the standard this Court has historically required; *Ewing* sets out the standard as "a showing of clear, satisfactory, *or* convincing evidence[.]" *Ewing*, 96 Idaho at 426, 529 P.2d at 1298 (italics added).

[7] The uncontroverted facts are that Father had been absent from his children's lives from December 2014 until sometime in 2019, well after the instigation of this child protection action. There is no suggestion of his ever having made a financial contribution to his children during the time he resided in Mexico. It was not until after the pendency of this action that he even acknowledged his paternity of the children. Despite having legal recourse and obligations as the father of these children, he apparently took no affirmative action to parent them while Daughter and Son languished in the care of their mother. Notwithstanding these facts, Father was presumed to be a fit parent.

Department but by a diligent GAL and personnel in the CASA Program. Counsel for the GAL noted during the hearing on reconsideration:

> Before, it was our concern that we didn't know any information. Now we find out that there is information, but nobody really looked for it. My concern now is, *how much more information have we not found because we haven't looked for it?* At a bare minimum, I think the evidence that we have before the court now triggers an obligation to look . . . [T]he presumption that the court, I believe, was affording [Father] as a fit parent because he was the biological parent, applies only when there is no evidence to the contrary, and I think we do have evidence to the contrary.

(Italics added). While the desire to place children in a permanent home with their biological parent and to dismiss a case may be laudable, it should not result in the failure to insist on a thorough investigation before that decision is made, especially as here when the facts raise legitimate concerns.

We continue to recognize that the biological parent's presumption of fitness is and should be very strong. However, it is not irrefutable. The biological parent's presumption is a creature of constitutional law. *See Idaho Dep't of Health & Welfare v. Doe (2009-21)*, 151 Idaho 300, 309, 256 P.3d 708, 717 (2011). This presumption operates in conjunction with the statutory scheme set forth by the Idaho Legislature. Where the legislature has unequivocally placed a duty on the court and the Department to consider its primary concern "the health and safety of the child," it is incumbent on a court to ensure that diligent investigation occurs regarding questions pertaining to children's safety. *See* I.C. § 16-1601.

## IV.    CONCLUSION

For the foregoing reasons, we vacate the magistrate court's Amended Conditional Order to Vacate Legal Custody and Dismiss Child Protective Case as to [Daughter and Son], and the magistrate court's Order for Placement Outside United States as to [Daughter and Son], and remand the matter for further proceedings.

Chief Justice BURDICK, Justices BRODY, BEVAN and MOELLER CONCUR.